Would the lawyers please approach the bench and introduce yourselves. My name is Marcy Jacobs. I'm an assistant state's attorney representing the people of the state of Illinois. Professor Finkel, F-I-N-K-L-E, on behalf of Howard Morgan and with the Kootenai Public Defender. Good morning. Mr. Finkel, how much time do you want for rebuttal? I'll be asking for three minutes for rebuttal. Okay. All right. Let's proceed. May it please the Court. Good morning, Your Honors. My name is Lester Finkel. I'm here on behalf of Howard Morgan. And this case basically concerns Mr. Morgan's conviction for attempt first degree murder of four police officers as well as aggravated battery against one of the officers, Officer Wrigley. Mr. Morgan, as I'm sure Your Honors are aware, when this incident was all over back in the February 21st of 2005, he wound up getting shot 28 times, spent several months in the hospital. And then after that time in the hospital, he was charged with the attempted murder. And I just want to go and provide a little bit of timeline because that timeline is relevant to the first two issues. And I will be focusing on the first two issues that are contained in the brief. There are four issues in the brief, one concerning the preclusion of acquittal evidence at the second trial, the other concerning voir dire and the restriction on voir dire, the third concerning prosecutorial misconduct, and the fourth concerning double jeopardy. But again, my arguments will be focusing on the first two issues that were presented in the brief. The acquittal and the... The acquittal and the voir dire, the restriction on police misconduct questions for the voir dire. And just to provide a little bit of a timeline, the first trial occurred in 2007. And at that first trial, and by the way, it was in front of the same judge, it was in front of Judge Clayton Crane. And at that first trial, the jury found Mr. Morgan not were hung on one count of aggravated battery against Officer Wrigley, but they were also hung on the four attempt murder counts. Now, there was an interlocutory appeal under Rule 604 before this court, 604F. And before this court, this court, I believe it was a 36-page opinion in 2009, held that a second trial can occur. But in the process, and I just wanted to go and make reference to that, in the process, and that was Appeal No. 073373, in the process, this court wrote, and if I may quote, this court wrote that the issue sought to be precluded in the later trial was whether it was the same one involved in the previous trial. And this court additionally wrote that defendant asserts that in acquitting him of those counts, the jury necessarily decided that he did not discharge a firearm during the incident. And in the course of reviewing it, this court held that those charges for which he was found not guilty were not directly related to the four attempt murder charges and the one remaining aggravated battery charge, because they were distinct offenses. And because they were distinct offenses, a second trial on attempt murder could occur. And that partly is the key, and that goes directly to the first issue. In People v. Ward, which is from 2011, the Illinois Supreme Court held that whenever you have evidence of acquittal, the jury is entitled to know. Whenever you have evidence of acquittal? Of a prior, of a prior offense, of a prior other crime, of prior conduct. Actually, that case involved an aggravated criminal sexual assault, didn't it? That case involved an aggravated criminal sexual assault. And then the state, that case, sought to introduce evidence of a separate aggravated criminal sexual assault involving another woman, did it not? That's correct. All right. And it occurred at a different time, a different place, and obviously, two different victims. Two different victims. But Ward based its ruling on Bedoya and Overton. And Bedoya, again, was a case involving a murder charge where the defendant in that case took shots, fired a weapon at three different buildings earlier in the day, correct? That is correct. And those were separate incidents that were tried, and the defendant was found not guilty of those aggravated discharge of a firearm at three different buildings, correct? At three different buildings. Okay. But we remain... And in this, and in the Supreme Court case of Ward, the defendant was found not guilty of the aggravated criminal sexual assault for which the state presented evidence of that crime at the trial on a separate aggravated criminal sexual assault. And I think the point Your Honor is trying to make is that these were separate crimes, and therefore, because they were separate crimes, and the state introduced evidence of those separate crimes, therefore... Other crimes evidence. Other crimes evidence. Which is a completely different, you know, area of the law than what I think is involved in this case. Respectfully, Your Honor, I have to disagree that it's not a completely different area of the law. But let me ask you this, how is it relevant that there were prior acquittals? It's relevant because the state was still seeking... Again, going back to the original appellate court decision, the interlocutory appellate court decision from this court, this court parsed those aggravated battery and aggravated discharge counts as being separate entities, separate conducts that were in no way probative of whether or not attempt murder occurred. And... Well, didn't this court basically say that the decision of whether or not there was an acquittal could have been based on all sorts of things, and we couldn't speculate as to why the decision on certain counts, but could not reach a decision on the attempt murder charges? That is correct. And in that original case, the one count that the jury could not reach a verdict on involved aggravated battery of one of the one officer who actually had some sort of a wound, correct? Well, there were three officers who had wounds. Yes, but describe the three different wounds of the three different officers. Why don't you recall that for us? Well, one of the officers had what seemed to have been a ricochet wound to his calf. Yes. Another officer had a wound to his right shoulder, and then when he went to Stroser Hospital and they were taking off the jacket, they found a spent shell that fell off of his jacket. Did he have any wound to his chest? He did not have a wound to his chest. He had bruise marks to his chest, but the jacket prevented any wound. He simply had a wound to his forearm. And was that one of the counts that the jury entered a finding of not guilty on? I believe that was one of the counts that the jury entered a finding of not guilty on, because there were the two counts of aggravated discharge and then the two counts of aggravated battery. Well, which was the count that they were able to, which was the count that they were unable to reach a verdict on as far as the aggravated battery to a police officer? They could not find, the aggravated battery they could not find as far as aggravated battery to Officer Wrigley. What was, that was the hung jury, right? That was hung on aggravated battery to him, as well as the four counts of attempt murder, that's correct. What were his injuries, Wrigley's? Officer Wrigley's injuries, and let me refresh my memory on that. Officer Wrigley felt a pain to his left arm. He was the one who was taken to Strozier Hospital. He was the one, in fact, who had the bullet that was in his protective bulletproof vest. That bullet fell to the ground. He was treated and released at Strozier Hospital for an injury to his forearm. He was there approximately three or four hours. What was the injury to his forearm? There was a through and through bullet to the forearm. Okay, was there any other bullet entry wound of the other two officers? Well, there was the graze to Officer, I believe it was Officer White. There was a graze to his leg, but that was also through and through. The bullets that actually hit the officers, or allegedly hit the officers, those bullets were never recovered. The only recovered bullet, as far as the evidence is concerned, was the bullet that embedded in that jacket of Officer Wrigley, and it fell to the ground when he was being undressed at Mount Sinai Hospital. Okay. And these are, and I realize what your honors are saying, that when you have evidence of other crimes or other separate incidents, that's a different situation, but the rationale of war, I would submit, does not make that distinction. And if I may, with this court's permission, I would like to point out exactly what Ward said in 2011. And Ward talked about how to assess the credibility of witnesses, weigh the evidence presented, and resolve conflicts in the evidence, and draw reasonable inferences from the evidence that to perform this function properly, the juries logically must have access to as much relevant, admissible evidence as possible. Because without that evidence, the reliability of the jury's conclusions is called into question. And the state was able to take that same evidence that it presented at the first trial, repeat it at the second trial. We're not arguing... Did the state ask to use this evidence? Well, there was a motion in Limine in which the state asked to use this evidence, and in fact, Professor Stone objected to that, yes. At the second trial, there was a motion by the state to use what evidence? There was a motion in Limine presented by Professor Stone at the second trial to bar introduction of this other crime's evidence that was used at the first trial that wound up getting either a not guilty or a hung on the one count. And then at the second trial, during the motion in Limine, the trial court said, no, I'm going to allow the state to go and introduce that evidence. And we're not actually contesting that. We're not contesting the propriety of admitting that evidence. What we're contesting, and we're saying that Ward absolutely demands, is the ability to respond or rebut to that. The jury is told that Mr. Morgan discharged a firearm at these four police officers. The jury was told that he committed aggravated battery, essentially with the same evidence. How would the state proceed on these attempt murder charges, in your opinion? What should the trial judge have done here? The trial judge should have allowed the evidence of acquittal to come in. Not bar the evidence of the... Right, we're not saying that the judge should have barred the evidence. But I thought you said that was a motion in Limine to bar that evidence. The evidence was to allow the acquittal evidence to come in. No, I thought you said that Professor Stone filed a motion in Limine to prevent the state from using evidence that related to these other firings. He did ask to bar that, but saving that, he asked for the ability to present acquittal evidence in order to respond to it. And on appeal, we are not saying... But you're saying this is really another crimes evidence case. Yes, I am. And in the Ward case, wasn't that... Again, we've already concluded it involved a separate offense occurring on a different date, different time, different place, different victim. Correct. But in addition, wasn't that evidence presented under the statute that allows for propensity evidence? Ward involved propensity evidence, but Bedoya and Overton did not. No, but Bedoya involved shooting at a building that was totally unrelated to the murder charge that happened later in the day. Respectfully, I would say that it wasn't totally unrelated. Well, it was. He was charged separately, and there was no connection ever established between the defendant firing at buildings, three different buildings, earlier in the day. There was never any connection between that evidence and the murder that occurred subsequent on that same day. But the state introduced that evidence in order to show what the officer did and what happened afterwards. But this whole idea of allowing propensity evidence is only allowed in one area of the law that we have right now in Illinois, and that's in sexual assault cases. Before that, you weren't allowed to use evidence. You could always use evidence of other crimes if the court did the proper balancing test. But you couldn't use that evidence for propensity, ever. It was improper to show that this person is more likely to commit a sexual assault because he committed it on another day. Wouldn't you agree with that, Mr. Finkel? I would agree with that as far as sexual propensity evidence. But I would also point out that in People v. Overton, you had an officer who was going on the way to the scene. There was a radio dispatch of an armed robbery at a gas station. That was introduced. I realize Your Honor might say, well, that was another crime as well. It was. Overton was involved in two separate armed robberies, two different victims, two different times. Is that true? Correct. But there was still a radio dispatch. The officer is on his way. He comes to the scene. He arrests the defendant in that case for the armed robbery of the gas station. That evidence is introduced. And the entire point of Overton upon which Ward relied, upon which Bedoya relied, was that you need to go and allow this acquittal evidence to come in. Because without the acquittal evidence coming in, you don't have the information before the jury. And the jury needs to have that total assessment, the credibility, the information before it to know what to do. Well, in Ward, wasn't there a suggestion that the victim in the other crime, that there was a trial, that he was charged for some criminal proceeding, and the jury was left with the impression that he might have been found guilty of that, when in fact that was contrary to what actually occurred. He was found not guilty of that particular other aggravated criminal sexual assault. A jury found him not guilty. And I would compare that to this situation where he is still charged with aggravated battery to a police officer. And the jury is under the impression that he, that basically this issue had never been resolved before. The trial court prevented anyone from mentioning the word previous trial. They could only talk about previous proceedings. And Ward went further and pointed out that under the federal evidentiary rules, federal courts have a different way of looking at things. Federal courts do go and say that evidence is not admissible, except with respect to collateral, estoppel, and double jeopardy. But Ward went and said, we don't have to look at the other jurisdictions. We don't have to look at the federal case law in order to decide what to do. All we have to do is look at our own cases. And I realize the distinction that Your Honor is making, but Ward doesn't make that distinction. You know, our contention is... Well, they refer to it as other crimes. The traditional doctrine of other crimes being another offense occurring on a different date, different time, different victim. They refer to it as other crimes, but our contention is that this is another crime. This is a crime because there were, let's see, four, eight counts that were originally charged against Mr. Morgan. And of those eight counts, four of the counts were the attempt murder, two of the counts were aggravated discharge of a firearm, and two of the counts were aggravated battery with a firearm. And those other counts are as if they are other crimes. And the rationale of Ward is not restricted from one to another. The rationale of Ward simply goes forward and says that when you have evidence of innocence, it has to go and be presented to the jury. So we should get to some of these other issues, the voyadier and the prosecutorial misconduct. On the prosecutorial misconduct, there was another motion in limine, Your Honor, and at the motion in limine, the trial judge went and said, you are not going to be allowed to ask any questions concerning police misconduct. You can ask about racial bias, you can ask about other issues, but not specifically police misconduct. And there was, I believe it was on page 21 of the reply brief, of the yellow brief that I provided to you, in which we have the entire quote over there. And I realize that the state is countered by saying that indoctrination of a jury is normally impermissible. And we don't dispute that area of the law. Indoctrination is. But there have been three exceptions recognized by the appellate court. But the question that was asked here was somebody's view on police officers. Well, I would have to dispute with whether or not that question was asked, because we never got to the point of questions being asked to the jury, because everything was resolved at that motion in limine. But there was no specific question for the court to rule on, was there? Trial counsel asked the trial court whether or not we would be free to go and ask about police misconduct. Because this entire case is basically pervasive with police misconduct. You have to remember, Your Honor, this is four police officers, 1230 at night, with an African-American police officer, because Mr. Morgan was African-American police officer with the Burlington-Northern Santa Fe Railroad. What was his testimony about that? He basically said that, what did he say? Did he say he didn't fire his weapon? Did he say he wasn't driving on a street, a one-way street going the wrong way? What did he say about that? He said he was at 19th and Lawndale. Was he going the wrong way on a one-way street? No, he testified he was not going the wrong way down a one-way street. He testified that he was curbed at 19th and Lawndale, that he got out of the van, that he started to immediately yell, I'm a cop, I'm a cop, I'm a police officer. And in fact, the four officers who testified also said, they admitted, I'm a police officer, I'm a police officer, I'm a cop. And then from that point forward, the two stories essentially start to diverge. The officers said, the four Chicago police officers said, that he had become immensely belligerent, would not put his hands up on the van, kept screaming, they kept telling him to make your hands visible. He wouldn't make his hands visible, and instead they had to struggle with him. They fell to the ground, and after falling to the ground, the four Chicago police officers said that they saw him reach into his waistband and that one of the officers started to scream, he's got a gun, he's got a gun, and that's when the shooting occurred. So what was the basis for the stop if he wasn't going down the wrong way? According to the police officers, according to the four Chicago police officers who testified, they said that he was going the wrong way down Hamlin, that he was going northbound on a southbound street of Hamlin, which wasn't too far from 19th and Lawndale. But where was the van actually found? There was an investigation. Where was this van when this incident took place? Well, the van eventually stopped right at the corner of 19th and Lawndale. Is that China's question? My question is, was he mid-block? Was he at an intersection? Where was he? According to the testimony, he was going southbound on Lawndale, and he pulled over to the right just past the intersection at 19th Street. But did it just become one way at that point, or was it one way previously? No, Lawndale was two ways. The testimony was that the officers were dropping off a curfew violator, and that while dropping off the curfew violator, they heard a noise, they looked over, and they saw a van going the wrong way down Hamlin, not Lawndale, but on Hamlin. That raised their suspicion. They followed. The police officers said that he then turned, I believe it was, east on 15th Street. He went to Lawndale. He turned south on Lawndale. So he wasn't going the wrong way at that point when they stopped him? Not on 15th and not on Lawndale. Their testimony was he was going the wrong way down Hamlin, correct. With his lights off. With his lights off, that's correct. And the witnesses said the lights were on. And the witness. Correct, correct. And as it turned out, he lived there. So what was the basis of the stop again, that the lights were on and he wasn't going down the wrong way on a one-way street? That's a point of contention, Your Honor. I mean, ostensibly the officers started by saying that, well, they saw him doing a traffic violation by going the wrong way down Hamlin. But by the time they stopped him, there was no traffic violation. By the time they stopped him, he was approximately one block from where he lived. But by the time they stopped him, they wanted to go and basically check out the scene. There was an undercurrent also that's in the record that in that neighborhood at that time, there had been a series of robberies by someone who, if Your Honor recalls the record, there had been a series of robberies by someone pretending to be a police officer. Yeah, here's the problem with that. That's my neighborhood. Right. So it's not my neighborhood. And there was that undercurrent that was asked and brought up to the officers that basically there had been other individuals, there had been a series of robberies, and that someone had been claiming to be a police officer and claiming to be a police officer then went and committed this offense. But at the time that this happened, I believe that Mr. Morgan was 55 years old. He had been 17 years with the Burlington-Northern Santa Fe Railroad. Before that, he had been eight years with the Chicago Police Department. And you have to remember, you have the four police officers, and although this is not an issue, it's just it sets the background over here. This isn't directly one of the issues that was raised in the brief, but you had the four police officers, two of whom had been officers for approximately two years, one had been an officer for approximately three years, and then I believe it was Officer Wrigley. He had been an officer on the Chicago Police Force for just two or three years, but he had been a police officer at the St. Louis Police Force for, I believe, nine or ten years. Dealing with the board here, as Justice Gord said, there was no proposed questions. What are the questions that you need to know about to determine what the jurors thought about police conduct? Not just police conduct, but police misconduct. And what trial counsel was trying to ascertain was, did the jurors have any preconceived ideas or attitudes about police conduct? Did they believe that police can sometimes overreact? But wasn't there enough questions asked to bring that out? The judge kept asking over and over, is there anything else about policemen that we should know about? Whether you like them, whether they're in your family, whether you've had incidents with them, isn't that enough to find out what the jurors' potential belief is about police officers? I would have to disagree, Your Honor. What other questions? That wasn't enough. I mean, going to the next part about racial bias, for example, at one time Professor Stone asked a question about, do you believe that people may have racial bias? The trial court allowed that question. The follow-up question was, do you believe that police officers can sometimes have racial bias? As soon as the words police officer and racial bias were inserted into the question, the trial judge said, you can't go there. You can ask about racial bias. You can ask if they believe that people have racial tendencies and fears and prejudices. But you can't ask about police. So the general questions that the trial judge asked about police officers, your opinion of police officers, without going directly to the issue of police misconduct was not enough. And I would relate this. Well, didn't the court ask the question whether you would treat the testimony of a police officer more favorably than any other witness? Yes, the judge did that. And that goes to the entire question of open versus closed questions. I believe all of you have been trial attorneys, Your Honor, trial judges. And there is a fundamental difference. There is a universe of difference between saying, would you treat someone's testimony differently versus what are your attitudes about police misconduct. One simply generates a yes or no question. The other generates a true statement of attitude. And I would relate it to the three categories of cases that the appellate and the Supreme Court have held are permissible inquiries without indoctrination. People versus strain, which talks about gangs. People versus lantern, which talks about drug addiction and alcohol addiction. And people versus stack, which talks about insanity. And just taking insanity as the example, if there's a question saying, do you believe that if someone adequately raises an insanity defense, would you hold that against him? That is fundamentally different and fundamentally insufficient as opposed to saying, what are your attitudes about someone who raises the defense of insanity? And the same thing with gangs, which is what strain recognized. It is a fundamentally different question to go and say, would you hold it against my client if you hear that he's a gang member? Versus, what are your opinions about gangs in the city of Chicago? One elucidates information from the jurors about their opinions. The other is simply a yes or no question that goes absolutely nowhere. And with respect to that, asking questions about police misconduct and asking questions about police racial bias, not just racial bias in general, or can you trust a police officer or believe a police officer, is much closer to those areas of law with gangs and drug addiction, alcohol addiction, and insanity than it is to the other types of cases that talk about indoctrination. And if I have, I'm not sure how much time I have left, but if I have just one moment. Again, people, just returning to the first issue. With respect to People v. Ward, People v. Ward, Bedoya, Overton, in our opinion, is controlling. Now the state predominantly relies on People v. Stevens, which is from 1921, and a series of federal cases. Turning to the federal cases first, Your Honor, those federal cases, we have no dispute, that is what the federal law says, but there should also be no dispute that in deciding on People v. Ward, the Illinois Supreme Court said we will not follow federal jurisprudence. We have that right not to go there and not to adopt that as far as an evidentiary rule in Illinois is concerned. And they did refuse to adopt all of the cases that the state cited with respect to the federal law. And as far as Stevens is concerned, Your Honor, the age of the case, simply being 1921, doesn't make it bad law. But in 1963, which I put in the yellow brief, there was the case People v. Heron, which already distanced itself from Stevens. And in the main body of the brief and in the reply brief, Ward effectively overturns Stevens, that Stevens has no more force and effect. And in that case, Your Honor, in Stevens, the Illinois Supreme Court, taking off from Justice McBride's questions, Stevens involved an individual who was accused of murder of one police officer and attempted murder of another police officer. And for reasons that, you know, 93 years later I do not understand, they charged the defendant under two separate indictments rather than two counts of one indictment. They went to one trial, he was acquitted of murdering the one police officer, Officer Olin, I believe it was, and he then went to the second trial. The proposition in Stevens, however, said that simply proof that you were found not guilty of a murder does not ipso facto establish that you did not commit an attempt murder of the second police officer. That's not what we're saying. That's not what we're arguing. We're not arguing that the fact that there was a finding of not guilty on these other counts proves that Mr. Morgan did or didn't do anything. We're simply saying that a jury without the information is a blind jury which doesn't understand what the true verdict should be. We understand what you're saying, and we've read the briefs and your time has long gone, but we'll give you some time. Thank you very much. I have just one final question. This is not a double jeopardy case. You're not saying, since the Paul Court already ruled that he could be tried. Double jeopardy was the fourth issue, but we recognize under the doctrine of law of the case that for this court this is not a double jeopardy, but if this were to go to the Illinois Supreme Court or in a federal habeas petition, they would be free to examine that issue. But the PLA was denied originally after the initial Rule 23 was issued in this case, holding that double jeopardy didn't bar the re-prosecution of these charges. Isn't that correct? That is correct, Your Honor. But once the Supreme Court denied it, doesn't that, and then it goes back for trial, doesn't it become law of the case? It still becomes law of the case for this court. My research reflects that a denial of a PLA is neither probative one way or another of the validity of the issue, just like a cert petition, a cert denial, is not probative, and that the law of the case would not bar the Illinois Supreme Court, if this case goes to the Illinois Supreme Court, it would not bar the Illinois Supreme Court from considering the issue. Thank you very much. Let's hear from the State. Good morning, Your Honor. Marcy Jacobs, Assistant State's Attorney on behalf of the people of the State of Illinois. With regards to Issue 1, if this jury were to be told that the defendant was tried before on the same incident, and the first jury acquitted him on charges that involve most, but not all, of the same exact facts, that it was this second jury's duty to decide, that would be an unprecedented, an egregious infringement on the province of this jury to decide the facts of the case before them for itself. And it's in no way comparable to Ward, where the Ward jury only had to consider wholly unrelated cases, wholly unrelated, a crime that happened at a different time, a different place, involving a different victim. But most significantly, the Ward jury was not charged with having to decide the fate of defendants on the case that it was told about the other jury's decision on. If Ward were to be applicable in this case, and its primary rationale, as defense counsel has told you, was the complete context rationale, then this jury would have had also been told that the first jury hung on the very same counts, that it was their duty to decide. And if this were a retrial of a jury with hung counts and convicted counts, then this jury would have to decide whether or not it was their duty to decide. And this jury would have to be told that another jury had convicted on counts that involved many of the same facts, that it was now their duty to decide. So no, this court should not be in any way persuaded by defendant's argument that the facts here can be bent and fit into the rationale of Ward. And it need not be, because indeed there is a case, People v. Stevens, which is still good law. It has not been overturned in any way by People v. Herron. And People v. Herron, that court found that the previous acquittal did necessarily find facts that were true that prevented the prosecution from even bringing evidence of the acquittal, much less evidence that he was acquitted, but evidence at all. And so therefore the question of whether the acquittal evidence should be admitted was never even gotten to, because it didn't make it that far. So it was distinguished, but it was not in any way overturned. Certainly Ward did not overturn it, because Ward takes place in a completely different context, the context of other crimes, which is very far removed from what we're talking about here, where this jury is considering the same exact incident with intertwining facts. And it would be an absolutely unprecedented infringement in the province of this jury to make the decision on those facts. I mean, essentially the bottom line here is that the defendant was acquitted on other charges, and he was shielded by double jeopardy, by the principles of double jeopardy, from being retried on those charges. But now what he's trying to do is to use the double jeopardy principles and use those verdicts that did not in any way necessarily establish his innocence as a sword to prevent another jury from finding him guilty on charges that are separate and distinct, allowing him to be acquitted. And allowing him to do so would be unprecedented. And as Justice McBride has pointed out, there's a lot of other very distinguishing facts between Ward and the facts of our case, that the Ward court was very, very careful to limit its holding to the facts of that case, because it involved overly persuasive propensity evidence, the nature of the fact that it involved propensity evidence. And it totally recognized that the unusual instances in that particular statute, which allowed propensity evidence, made that that case very limited to those facts. And any other cases that it looked at, it acknowledged it, that Bedoya and Overton, that when it looked at those cases, the information that it got from them was only dicta, which this court did not have. Need not follow this court, needs to follow People v. Stevens, which was 100% on point, and still good law, and this court's bound by it. It involved, regardless of the amount of, if it was two separate indictments or one indictment, the fact is it involved the same exact incident, two officers getting shot. That defendant wanted to offer the evidence of the acquittal, that he was acquitted on the charge of the first officer who was murdered. And the court found that that, and he wanted to do it for the purpose of tending to show his innocence, and the court found that that argument was without force. And the defendant is trying to do the exact same thing here, and that argument is without force here as well, and this court should find so, because it is bound by Stevens. It certainly, the defendant has not shown that the trial court has abused its discretion in any way, that no reasonable person, that no reasonable person would take the view adopted by the trial court, so this court should defer to the good judgment of the trial court and affirm this issue on that, on those grounds. With regards to the voir dire of this case, the entire point of voir dire is that the defendant received an unbiased and unprejudiced jury, and the standard is that the, whether the method used in voir dire creates a reasonable assurance that the president is guilty of the crime. That prejudice would be discovered if present, and there is no question that in this case, that standard was far exceeded by the extensive and exhaustive questioning by the judge who explored exhaustively each individual juror's opinions of police officers and their relationships and what they talked about and how they knew them and how long they knew them, and with the catch-all question that you should know, and even the judge- But the judge did not allow him to ask, what is your views about cop-on-cop shootings? Should they be found out about that? Sure. The exact question that he was not allowed to ask is, quote, whether or not a jury is willing to believe a police officer could, in fact, engage in improper conduct, and his justification for wanting to ask that question was, he wanted to know if they would be jurors that could accept defendant's theory of defense, which is that there was police misconduct in this case. You know, the law says that questions designed to educate jurors as to a defendant's theory of defense prior to trial as a means of selecting a jury that would be receptive to his defense are properly disallowed, and that's exactly what his stated reason was on the record for wanting to ask that question, and that's exactly what his question implied. I mean, there was no, this case, the entire case wasn't at all about police misconduct. Only defendant's defense was about police misconduct. The entire case is about what happened in this case when four police officers went to work one day and were brave enough to take on a high-risk assignment, a traffic stop in the middle of the night in a high-crime area. Don't call it high-crime. I'm so sorry. Quoting from the record, and they were brave enough to take on this assignment, and they were shot at, and that's what the theme of the case was. A defendant tried to, certainly tried to assassinate the officer's character and making them sound corrupt, even depraved, because his defense actually suggested that they, within a context of 30 to 60 seconds, the two sets of officers who had never even met before, managed to collaborate to grab the defendant's gun, and he passed out, and sit around shooting each other with the gun into their bodies, and, well, at the same time shooting him, so that's what the case was about. The case was not about police misconduct unless it was his defense, and I would say that while the defense talked about the very, very limited and specific defenses that are allowed to be asked about, this case, asking about police misconduct, is far, far more alike to the defenses that this court has found that defendants are absolutely not allowed to ask about. The Supreme Court has said that it's an area of viable questioning, for example, gangs. Now, because the defendant is entitled to inquire about that, does that give the defendant the right to inquire in any way that he or she wishes? For example, you know, how do you feel about gangs, or do the cases suggest that those questions can be tailored to, you know, more specific questions? Well, certainly, you know, before you even answered it, I mean, would it be proper to ask a venerey person whether they ever experienced police misconduct? I don't think that would be proper, either. I mean, if they were allowed to ask that, then we're allowed to ask, are police officers who do traffic stops, high-risk traffic stops, did they ever experience violence? When they're trying to do a traffic stop. And, of course, we wouldn't be allowed to ask that. Well, I don't think one thing has anything to do with the other, but if you ask a specific question about a person's experience with police misconduct, I think that would be appropriate. I think it's always been appropriate. I think it's always been used. That question was not asked here. I don't think it's property to ask questions about what do you think about police misconduct, because then it becomes a circus. Your Honor, even if that question would have been a proper question, the fact of the matter is the defense did not put that question before the judge to decide. The question that the defense put before the trial court to decide was what I had already read, and that question was improper. But I will go back to saying that there's no question in this case that every juror was given beyond ample opportunity to weigh on police. And even the trial court admonished the entire panel that if they felt hesitant or embarrassed to answer any of these questions in front of the whole veneer, that he would take them aside privately, stressing the absolute necessity and how essential it is to be truthful and their answers complete. They knew the nature of the case absolutely, because defense counsel asked so many questions himself to make sure that these jurors knew everything that was going on. And I can give you a couple examples. So the defense counsel gave, this jury absolutely knew what this case was about, point blank. They knew it was about an officer's shooting. The people submit that if a juror was prejudiced, who landed on that shooting ground, that he would have been dismissed from the jury. It was simply because they chose not to be truthful. And no matter how many times they were admonished, and how many times they were asked how many catch-all questions about could they be fair to defendant in this case. And there's nothing that anyone can do to prevent that, but we certainly met the standard here that there was a reasonable assurance that we found. How many potential jurors were dismissed for cause? Let you know that there were five were dismissed for cause because they were found to be biased in favor of police. Three were dismissed for cause because they were found to be biased against police. Two were dismissed for cause they were biased, it was a little unclear who they were biased against. The defense went on to dismiss a couple of more. There's no question that the standard was met. That's what we're looking at here. Was that standard met? It absolutely was met. The defendant is not a juror. The defendant is not entitled to ask whether or not a jury is willing to believe a police officer could in fact engage in improper conduct any more than the state is willing to ask, whether a jury would be willing to believe that an offender stopped in a traffic infraction could shoot at police. That is why the law says that we cannot indoctrinate our juries as to the defendant's theory of defense. And defendant's theory of defense is far closer to all the ones that are disallowed in this state, such as self-defense, false confessions, mistaken identity, compulsion, handguns. The affirmative defense of legal insanity was a very extreme and controversial defense, and it was very specific in nature as to why questions were allowed to be used on that defense, because it affected the form of the verdict, is what the court found in that case. And getting back to your question, Justice McBride, as to the Gaines case, that again, this court has dismissed the defendant's theory of defense as pervasive. Many, many, many times already decided that it was not going to expand people versus strain to include anything other than Gaines, that this court has said that that case is very specific to Gaines. It did not choose, and it would not choose to expand it. But the most important thing about what people versus strain said is that the Gaines evidence in that case was pervasive. It was the pervasive issue throughout the entire case. The state side, the defense side, the jury side, the defense side, that is just not at all the case here. This is only defendant's defense. It's only, only, only relevant to defendant's defense in this case. Based on that, I would ask this court to affirm defendant's conviction to fine. Go ahead. I have one other question. On the closing argument, didn't the state's attorney cross the line when he said, I recognize him for what he was that night, an angry armed man who tried to kill four police officers who never did him any harm, who swore to serve and protect you. Wasn't he putting the jurors in the shoes of the police? I absolutely do not think that when you look, the law allows us and you and the reviewing court to look at the state's attorney's closing argument in its entire context, which includes the defense attorney's closing argument. It does not look at the state's attorney's closing argument in isolation. And the law allows, the law allows a response to the defendant's argument. And let me just say about defendant's argument, the entire tenor of defendant's closing argument was mocking and ridiculing and caustic in its criticism of these four officers that were the victims in this case, that were shot, the victims of being shot. She was talking out of a 50-page transcribed argument. Page two, she starts mocking them because their injuries were not more severe. Here's what she says up front on page two. What happened to everybody that night, she asked. Officer Finley was bruised and upset. Officer White had a leg injury that you will look and you can determine if it's a graze wound or not, and he was upset. Officer Wrigley had a flesh wound and a bruise on his chest. And in addition to minimizing the actual injuries, because these were not the extent of the injuries, she even made fun of them for seeking treatment. She made fun of them for leaving the scene and going to the hospital, insinuating that their injuries, one of which was a thrown through wound on Officer Olson's arm, she made fun of them for even seeking treatment. She said, White and Olson have taken off because they've got to get Olson to the hospital stat. Wrigley has gotten someone to take him to the hospital stat. She even made fun of the trauma surgeon that was there. He was so accomplished, in addition to being a trauma surgeon, he was also a police officer. So she mocked him for being quote unquote weird. So that gives the state's attorney the right to tell the jurors, the cops were here to protect your jurors. Well, this is just part of her argument. This is just page two. So pervading through her entire argument, the very next thing she does after she minimizes and mocks the lack of severity of the officer's argument, the very next thing she does is she Let me ask you this just for a moment. Do you believe that a defense attorney can open the door, that's what you're talking about, open the door for the state to say that what the officers did was to protect the jury? Because isn't the jury to be kept out of this? I mean, you're putting the jury into the place of the defense attorney. I mean, you're putting the jury into the place of the defense attorney. I mean, you're putting the jury into the place of the defense attorney. I mean, you're putting them into the case by that kind of a comment. I don't see how you could ever open the door to that comment. That's like pushing the envelope a little too far. Well, since I was interrupted, is this one of the preserved objections or was this one of the ones that was never objected? Okay. So we have to get through that plain error hurdle, don't we? Yes. Okay. All right. So if it went over the line, it's one thing, but before we get there, there were approximately six comments objected to and two were included in a motion for a new trial and the other six were not. Correct. Okay. All right. So not that I disagree with what Justice Gordon has suggested. Well, I do believe that the law says, the law says, yes, we can respond to him by the comments. That is what the law says. And we need to. A prosecutor would not be doing his job representing the people of the state if they could not respond to these caustic, mocking, I mean, the entire defense, the entire tenor of the defense was to vilify and engender hatred for the entire Chicago Police Department and completely vilify and assassinate the characters of these four officers that were brave enough to go to work that day. Yeah, but I think it's kind of a better argument to address to us that, you know, even if that is improper, it wasn't objected to and what the hurdle that they would have to go through for that one comment. Absolutely. Instead of trying to justify that type of thing. Well, let me also say that I believe the fact, I believe that the reason that those comments were not objected to, I believe that the reason that they were not objected to at trial and even after they were carefully considered in a post-trial motion is because the defense attorneys were there in the courtroom that day. They knew the tenor of their argument. They knew that those comments were invited by the tenor of their argument. That's why they weren't objected to. I believe this was a knowing forfeiture. But let me just point out just some of the other things that were said by defense attorneys so we can put in comment that. Well, isn't that pretty much outlined in your brief already? Yes, it's very much outlined in your brief, in my brief. Yeah, we're getting past the time. Okay. Thank you very much. Okay. Let's have a brief rebuttal. We'll make it one point, Your Honor. Mr. Finkel, just one question for you. Yes. Do you have any cases involving a factual pattern of offense similar to this that does not involve traditional other crimes evidence that you wish to direct us to, either a federal case, an out-of-state case, or any Illinois decision from our Supreme Court or any of the districts in this court that supports what you're arguing today? I don't mean Perry. I don't mean Overton. I don't mean Bedoya. I mean a case involving a factual situation of a retrial of the same offenses, not other crimes evidence. A retrial of the same offenses, yes. A retrial of the same offenses, no, Your Honor, I do not have. And I believe the State, even in their brief, said their research did not uncover any cases directly on point. Okay. But I do have one, just one point to make on this. Certainly. And that is, you know, the excellent argument made by the State. But during the course of that argument, she said, this entire case is not about police misconduct. You have a 55-year-old African-American man who is going home from his job at this time. Two white police officers. Two other white police officers. You know, we know all of that. It's all in the brief. It's in the brief, but my point is, this case is not simply about police misconduct. It wreaks police misconduct. It is seeped in every aspect of this case. And I realize the time is short. I thank you, and I ask for a reverse and remand. Thank you. Well, you know, you guys did a very good job. The briefs were very up to date to us, and we'll take the case under advisement. And the court is adjourned.